# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MICHAEL TOLENTINO, JUAN PACHECO, JAVIER GARCIA, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § § § § § § | |
| Plaintiffs, | § § | |
| | § | **Civil Action No.  2:09-cv-326** |
| VS. | § § | **JURY TRIAL DEMANDED** |
| | § | |
| C & J SPEC-RENT SERVICES, INC., | § § | **COLLECTIVE ACTION PURSUANT TO 29 U.S.C. 216(b)** |

## <u>OPPOSED MOTION FOR NOTICE TO POTENTIAL CLASS MEMBERS</u>

Pursuant to the Federal Rules of Civil Procedure, Plaintiffs Michael Tolentino, Juan Pacheco, Javier Garcia, Individually, and on behalf of all others similarly situated, file this Opposed Motion for Notice to Potential Class Members, and would show unto the Court as follows:

### INTRODUCTION

Defendant C & J Spec-Rent Services, Inc. ("C& J"), has violated Section 207 of the Fair Labor Standard Act ("the Act") by requiring much, if not all, of its blue collar workforce to work more than 100 hours per week but not paying a dime of overtime wages.  *See* 29 U.S.C. § 207(a).  The Act requires employers to pay overtime pay to employees engaged in commerce who work more than forty hours

in one week.  In an attempt to flank the requirements of the Act, C & J improperly and unlawfully classified their employees as exempt from overtime pay, although it is not clear on what basis C & J claims the employees are exempt.  However, the employees who are the subject of this litigation are not exempt from receiving overtime pay.  All of them performed difficult, dangerous and manual labor.

The declarations attached to this motion are from the named plaintiffs in this matter, which reveal the illegal pattern and practice of C & J of depriving its employees of any overtime pay.  Also attached to this motion is C & J's responses to written discovery.  The evidence filed with this motion is more than sufficient to meet the lenient standard for the Court to grant conditional class certification and allow notice to be given to the potential class members.

<u>FACTS</u>

While the actual number is unknown, there is many former and existing employees of C & J who have performed labor for C & J, who worked more than 100 hours per week, and who were paid no overtime wages.  Exhibits A (Tolentino Declaration), B (Pacheco Declaration), and C (Garcia Declaration) (each adopted and incorporated herein by reference).    Further, the plaintiffs sent written discovery requests to C & J for the purpose of learning facts that would reveal the nature of the alleged exemptions and the number of former and existing employees of C & J who were classified as exempt.  In the response to the written discovery, the plaintiffs obtained virtually no information because of boiler-plate objections.

Exhibit D (C & J's answers and objections to plaintiffs' first set of interrogatories). For example, in response to interrogatory number 4, which sought information about any defenses C & J had to the plaintiffs' claims, C & J responded with no information other than a boiler-plate objection.   Exhibit D, at p.5.   Further, in response to interrogatory number 6, which sought information about the number of employees C & J who were classified as exempt, C & J responded with no information other than a boiler-plate objection.  Exhibit D, at p.6.  The same boiler-plate objection was lodged by C & J with respect to the plaintiffs' interrogatory number 7, which sought the names, addresses and phone numbers of former and current employees who were classified as exempt.  Exhibit D, at pp. 6-7.  As the Court will see, C & J lodged the same boiler-plate objections to nearly every interrogatory served by the plaintiff, which were tailored to learn information from C & J that would provide evidence to this Court to satisfy the lenient standard to grant conditional collection action status.  Indeed, C & J stated in its responses to the plaintiffs' interrogatories that it will not provide requested information unless this Court grants conditional collection action status.  *See id.*  The plaintiffs assert that the position C & J takes is an invitation to this Court to grant this motion and, in any event, C & J's effort to conceal the information about alleged exemptions and former and current employees, alone, justifies the granting of this motion.

Additionally, the respective declarations of the named plaintiffs provide sufficient evidence to this Court to justify the granting of the motion so that notice

can be provided to the former and existing employees of C & J so that they may

join this action and have their rights protected.   The first declaration presented to

the Court is from Michael Tolentino.  He declares as follows:

> I was employed by Defendant C & J Spec-Rent Services, Inc.
> ("the defendant") from about October 2005 to January 2009.  I
> was based from the defendant's office in Robstown, Texas.  I
> was hired to work as a pump operator.  I was a pump operator
> for approximately 6-7 months.  After that period, I was asked to
> be a coil tubing operator.    I worked a coil tubing operator for
> about 6-7 months before I was given the title of coil tubing
> supervisor.  I had the job title of coil tubing supervisor from
> about December 2006 to January 2009, when my employment
> with the defendant ended.
>
> As a pump operator, I operated a pump unit that pumps fluid
> into the coil unit, which is used drill-out plugs or wash out gas
> wells.  As a coil operator, I operated a coil unit that is used to
> drill-out plugs or wash out gas wells.    As a coil tubing
> supervisor, I worked in the field exclusively, with 5-6 other
> workers.   I am intimately familiar with the jobs functions of
> each person.  There is a crane operator, a coil unit operator, a
> fluid pump operator, a nitrogen pump operator, and a transport
> driver.   I have performed all rig up operations and rig down
> operations.  When I was given the title of coil tubing supervisor,
> I was given the additional responsibility of communicating with
> the representative of the company which owned the rig that
> required service upon arrival.  Based on the defendant's policies
> and procedures, my co-workers and I would then decide where
> to place our equipment to begin work.  After that, I would then
> either operate one of the units myself, depending on the number
> of co-workers with me, or would assist each unit operator and
> ensure that everything was working properly.    Further,
> depending on whether we had any relief from other employees
> of the defendant, I would operate each unit while one of my co-
> workers was taking a break.   During my entire period of
> employment with the defendant, I would say more than 75% of
> my time was spent performing difficult, manual labor.  I never

worked in an office.  Further, for the first several months after being given the title of coil tubing supervisor, I was not given any pay increase.  Also, during my periods of employment, 90-95% of all work performed by the defendant in the field was coil tubing.  All of the employees of the defendant, including coil tubing supervisors, but except for office personnel and mechanics, worked in the field for the defendant performing coil tubing services, which is difficult, manual labor.  I believe that this is true of all operations at the defendant's office in Robstown, Texas, and Marshall, Texas.  I am familiar with both offices, because I was based in Robstown but have been to the office in Marshall, Texas, as well, to work with a crew there.  I also personally knew some of the crew members in Marshall, Texas.   We all performed the same functions regardless of the office from where we were based.  This is true of coil tubing supervisors, pump operators, crane operators, and coil tubing operators.

When I began my employment with the defendant, and based on my understanding from the defendant's representations, I expected to work about 60 hours per week, on average.  I was told that I could expect to work 14 days on and then have 2 days off.  But that was not true.  I never had 2 days off after any 14-day period.  I never expected to have to work 100 or more hours per week, as I did during my periods of employment with the defendant.   I often worked 21 or more days straight. Further, there were many times when I, as well as my co-workers, were required to work 24 or more hours straight with no rest.  I was given, on average, two days off per month, for which we had to beg for.  I was paid a fixed salary of $3,300 per month and discretionary job bonuses of $150 per job, during my first period of employment.  I was then given a pay increase to about $4,500 per month and then, at the end, to $5,000 per month, with a job bonus of $225.  I did not always receive a job bonus, especially if the defendant claimed that paperwork was not turned in on time.   I never received any overtime pay for any hours I worked in excess of 40 per week. I have personal knowledge that all employees of the defendant who worked in the field as operators were paid fixed salaries, regardless of the number of hours worked, and were never paid

any overtime wages for wages worked in excess of 40 per week, at least through the end of 2008.

The turn over rate for employees of the defendant was very high during my periods of employment. Typically, new employees would last about 3 months before quitting. This was due, in part, to the high number of hours we were required to work and the difficult nature of the job, which was all manual labor. At any given time, however, the defendant's office in Robstown, Texas, maintained about 8 units, which included 5-6 employees per unit, who worked in the field. We all performed the same job functions in the filed; that is, coil tubing supervisor, crane operator, coil unit operator, fluid pump operator, nitrogen pump operator, and transport driver. Further, it was very common for each operator to perform the functions of another operator, depending on the job and availability of employees. Every job we performed in the field was substantially the same as all other jobs. Generally, the only difference at each job was the depth of the well. I believe that there is no significant difference at all in the nature of the work performed by all operators in Robstown and operators in Marshall. In fact, crews from Robstown often worked in the Marshall area, performing the same coil tubing services. My best guess is that between November 2006 and November 2009, and due in part to the high turn over rate, there is a probably a total of 250 or more existing and former employees of the defendant who were operators and worked in the field, from just the Robstown office.

I had no discretion in how I performed my job for the defendant. I exercised no independent judgment. I never participated in any meeting where decisions were made to create any policies and procedures. Every task I performed for the defendant was performed pursuant to established policies and procedures that I did not implement. I had no authority to do my job contrary to established policies and procedures or in a manner that I believed was appropriate. If I had any problem at a job site that I was not sure how solve, I was required by the defendant to call the field supervisor. The field supervisor was ultimately responsibility for all the crews and job sites. The

field supervisor would instruct me how to solve any problems. I had no authority to hire and fire other employees, and never did. I had no authority to change the status of any employee or to even recommend a change of status of any employee, and never did. I had no input into the management of the general business policies of the defendant or of anything of significance. I know that this is true of all coil tubing supervisors for the defendant, because I knew each of them, as they came and went.

Exhibit A (Tolentino Declaration).

The second declaration presented to the Court is from Juan Pacheco. He declares as follows:

I was employed by Defendant C & J Spec-Rent Services, Inc. ("the defendant") from about August 2006 to March 2007 and then again from about August 2007 to August 2008. I was based from the defendant's office in Robstown, Texas. During my entire periods of employment with the defendant, I primarily performed the job of "pump operator."

As a pump operator, I operated a pump unit that pumps fluid into the coil unit, which is used drill-out plugs or wash out gas wells. On each coil tubing job in the field, there is generally 5-6 workers. I am familiar with the jobs functions of each person. There is a crane operator, a coil unit operator, a fluid pump operator, a nitrogen pump operator, and a transport driver. I have performed all rig up operations and rig down operations. Also, during my periods of employment, 90-95% of all work performed by the defendant in the field was coil tubing. All of the employees of the defendant, except for office personnel and mechanics, worked in the field for the defendant performing coil tubing services, which is difficult manual labor. I believe that this is true of all operations at the defendant's office in Robstown, Texas, and Marshall, Texas. I am familiar with both offices, because I was based in Robstown but have been to the office in Marshall, Texas, as well. I also personally knew some of the crew members in Marshall, Texas. I have also relieved

pump operators who were based in Marshall.  We all performed the same functions regardless of the office from where we were based.

When I began my employment with the defendant, and based on my understanding from the defendant's representations, I expected to work about 60 hours per week, on average.  I was told that I could expect to work 14 days on and then have 2 days off.  But that was not true.  I never had 2 days off after any 14-day period.  I never expected to have to work 100 or more hours per week, as I did during my periods of employment with the defendant.    I often worked 21 or more days straight.  Further, there were many times when I, as well as my co-workers, were required to work 24 or more hours straight with no rest.  I was given, on average, two days off per month, for which we had to beg for.  I was paid a fixed salary of $1,800 per month and discretionary job bonuses of $50 per job, during my first period of employment.   During my second period of employment, I was paid $2,600 per month, with a discretionary $75 bonus per job, which was then raised to $3,200 per month, with a $100 job bonus.  I did not always receive a job bonus, especially if the defendant claimed that paperwork was not turned in on time.  I never received any overtime pay for any hours I worked in excess of 40 per week.   I have personal knowledge that all employees of the defendant who worked in the field as operators were paid fixed salaries, regardless of the number of hours worked, and were never paid any overtime wages for wages worked in excess of 40 per week.

The turn over rate for employees of the defendant was very high during my periods of employment.    Typically, new employees would last about 3 months before quitting.  This was due, in part, to the high number of hours we were required to work and the difficult nature of the job, which was all manual labor.   At any given time, however, the defendant's office in Robstown, Texas, maintained about 8 units, which included 5-6 employees per unit, who worked in the field.  We all performed the same job functions in the filed; that is, crane operator, coil unit operator, fluid pump operator, nitrogen pump operator, and transport driver.  Further, it was very common for each operator

to perform the functions of another operator, depending on the job and availability of employees. Every job we performed in the field was substantially the same as all other jobs. Generally, the only difference at each job was the depth of the well. I believe that there is no significant difference at all in the nature of the work performed by all operators in Robstown and operators in Marshall. In fact, crews from Robstown often worked in the Marshall area, performing the same coil tubing services. My best guess is that between November 2006 and November 2009, and due in part to the high turn over rate, there is a probably a total of 250 or more existing and former employees of the defendant who were operators and worked in the field, from just the Robstown office.

I had no discretion in how I performed my job for the defendant. I exercised no independent judgment. I never participated in any meeting where decisions were made to create any policies and procedures. Every task I performed for the defendant was performed pursuant to established policies and procedures that I did not implement. I had no authority to do my job contrary to established policies and procedures or in a manner that I believed was appropriate. I had no supervisory or managerial responsibilities. I had no authority to hire and fire other employees. I had no input into the management of the general business policies of the defendant or of anything of significance.

Exhibit B (Pacheco Declaration).

The third declaration presented to the Court is from Javier Garcia. He declares as follows:

I was employed by Defendant C & J Spec-Rent Services, Inc. "(the defendant") from about January 2006 to November 2007 and then again from about May 2008 to November 2008. During my first period of employment with the defendant, I worked exclusively from the defendant's office in Robstown, Texas. During my second period of employment with the defendant, I worked for the first three months from the

defendant's office in Marshall, Texas, and then the balance from the defendant's office in Robstown, Texas.   During my entire periods of employment with the defendant, I primarily performed the job of "coil operator."

As a coil operator, I operated a coil unit that is used to drill-out plugs or wash out gas wells.   On each coil tubing job in the field, there is generally 5-6 workers.   I am intimately familiar with the jobs functions of each person.   There is a crane operator, a coil unit operator, a fluid pump operator, a nitrogen pump operator, and a transport driver.   I have performed each of these functions at various times throughout my period of employment with the defendant.   Also, during my periods of employment, 90-95% of all work performed by the defendant in the field was coil tubing.   All of the employees of the defendant, except for office personnel and mechanics, worked in the field for the defendant performing coil tubing services, which is difficult manual labor.   This is the case at the defendant's office in Robstown, Texas, and Marshall, Texas, respectively.

When I began my employment with the defendant, and based on my understanding from the defendant's representations, I expected to work about 60 hours per week, on average. Because of the nature of the work, however, I did not expect there to be a normal schedule.  But I never expected to have to work 100 or more hours per week, as I did during my periods of employment with the defendant.   I often worked 21 days straight.  Further, there were many times when I, as well as my co-workers, were required to work 24 or more hours straight with no rest.  I was given, on average, two days off per month, for which we had to beg for.  I was paid a fixed salary of $3,500 per month and discretionary job bonuses of $75 per job, during my first period of employment.   During my second period of employment, I was paid $4,000 per month, with a discretionary $200 bonus per job.  I did not always receive a job bonus.   I never received any overtime pay for any hours I worked in excess of 40 per week.   I have personal knowledge that all employees of the defendant who worked in the field as operators were paid fixed salaries, regardless of the number of

hours worked, and were never paid any overtime wages for wages worked in excess of 40 per week from long before November 2006 through at least October 2008, but perhaps later. This is because I know that the defendant began paying employees who worked in the field as operators an hourly wage in about October 2008, but cannot say for sure whether overtime wages were also paid beginning after that period.

The turn over rate for employees of the defendant was very high during my periods of employment.   Typically, new employees would last about 3 months before quitting.  This was due, in part, to the high number of hours we were required to work and the difficult nature of the job, which was all manual labor.   At any given time, however, the defendant's office in Robstown, Texas, maintained about 25 employees who worked in the field.    At any give time, the defendant's office in Marshall, Texas, maintained about 10-12 employees who worked in the field.  We all performed the same job functions in the filed; that is, crane operator, coil unit operator, fluid pump operator, nitrogen pump operator, and transport driver.  Further, it was very common for each operator to perform the functions of another operator, depending on the job and availability of employees.    Every  job  we  performed  in  the  field  was substantially the same as all other jobs.   Generally, the only difference at each job was the depth of the well.  This is true of all coil tubing jobs performed out of the Robstown office and the Marshall office.  There is no significant difference at all in the nature of the work performed by all operators in Robstown and operators in Marshall.  In fact, crews from Robstown often worked in the Marshall area, performing the same coil tubing services.  My best guess is that between November 2006 and November 2009, and due in part to the high turn over rate, there is a  probably a total of 250 or more existing and former employees of the defendant who were operators and worked in the field, from the Robstown office and Marshall office.

I had no discretion in how I performed my job for the defendant.   I exercised no independent judgment.   I never participated in any meeting where decisions were made to create any policies and procedures.  Every task I performed for

the defendant was performed pursuant to established policies and procedures that I did not implement.  I had no authority to do my job contrary to established policies and procedures or in a manner that I believed was appropriate.  I had no supervisory or managerial responsibilities.   I had no authority to hire and fire other employees.   I had no input into the management of the general business policies of the defendant or of anything of significance.

Exhibit C (Garcia Declaration).

Accordingly, the evidence before the Court shows that the violation of the Act by C & J is widespread.  That is, the evidence shows that there is more than 200 former and existing employees were unlawfully classified as exempt from overtime pay and were never paid any overtime pay for hours worked in excess of 40 per week.  The evidence establishes that these employees are similarly situated because of the narrow scope of the employment.  Each of them performed the same coil tubing services in similar locations, with the only discernible difference from each job being the depth of the well.  Thus, the named plaintiffs and the potential class have almost identical job requirements and their pay provisions were identical.

## ARGUMENT AND AUTHORITIES

### A.  The FLSA Authorizes Collective Actions

Where the employer's violation of FLSA is alleged to be widespread, aggrieved employees have the right to bring an action for and on behalf of . . . themselves and other employees similarly situated.   29 U.S.C. § 216(b).  Actions

pursued in such a representative capacity are referred to as collective actions.[1] Federal courts in Texas have a long tradition of using the collective action procedure to protect employees who are denied their proper overtime pay.  *See, e.g., Riojas v. Seal Produce, Inc*., 82. F.R.D. 613, 619 (S.D. Texas. 1979) (since the FLSA was meant to aid injured parties, it is only sensible that procedures facilitating this intent [such as providing notice to potential class members] would be favored).

Perhaps even more importantly, the United States Supreme Court has expressly held that courts may implement the collective action procedure by facilitating the issuance of notice to potential class members.[2] *Hoffmann-LaRoche Inc. v. Sperling,* 493 U.S. 165 (1989).   Commenting favorably upon collective actions, the Supreme Court noted:

> A collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.   The judicial system benefits by efficient resolution in one proceeding of common issues of law

---

[1]  As discussed *infra,* a collective action has important distinctions from a class action brought under Rule 23 of the Federal Rules of Civil Procedure.   For example, unlike the traditional Rule 23 class action, no employee shall be a party plaintiff to [a collective action] unless he gives his consent in writing . . . and consent is filed in the court in which such action is brought.  29 U.S.C. § 216(b); *see also LaChapelle v. Owens-Illinois, Inc.,* 513 F.2d 206 (5th Cir. 1975) (distinguishing the opt-out Rule 23 class action.).  Accordingly, certification of a collective action gives potential class members: 1) notice of the suit; and 2) the opportunity to protect their rights by filing a consent.

[2]  Many of the authorities cited by *Falcon* concern violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.,* (ADEA), as opposed *to* the FLSA.   The ADEA, however, incorporates the collective action remedy of the FLSA into its enforcement scheme, and, thus, these authorities are equally persuasive.  *See* 29 U.S.C. § 626(b); *See also Sperling,* 493 U.S. at 167-168

and fact arising from the same alleged . . . activity.

*Sperling*, 493 U.S. at 170.  However, these benefits depend upon the potential class members' receipt of a notice which is timely, accurate and informative.   *Blake v. Colonial Savings, FA*, 2004 WL 1925535 (S.D. Tex. August 16, 2004) (J. Harmon), *citing Sperling*, at 172.

      1.  The Legal Standard (Similarly Situated).

The Fifth Circuit has identified two procedures used by the courts to determine whether to facilitate notice.  *Mooney v. Aramco Servs., Co.*, 54 F.3d 1207, 1213 (5th Cir. 1995).  The first approach-the *Shushan* method-is premised upon a class action filed under Rule 2 3and espouses the view that the court should look to numerosity,   commonality, typicality, and adequacy of representation to determine whether a class should be certified.  *Mooney,* 54 F.3d at 1214, *citing Shushan v. University of Colorado,* 132 F.R.D. 263 (D. Colo. 1990).  The second-the two-step method-involves a two-step analysis of FLSA § 16(b)'s similarly situated requirement.  *Mooney,* 54 F.3d at 1214.  The two-steps consist of a lenient conditional certification decision, followed by a more rigorous certification decision after discovery is complete.  *Mooney,* 54 F.3d at 1214.

Notably, *every* appellate court to consider the issue has rejected *Shushan*'s

premise-that Rule 23 should apply to collective actions under § 16(b).[3]   Further, the Fifth Circuit has held that Rule 23 opt-out class actions . . . cannot be reconciled with § 16(b) suits [and] are not permissible in such actions.   *Price v. Maryland Cas. Co.,* 561 F.2d 609,611 (5th Cir. 1977).   Rather the FLSA collective action procedure created by §16(b) constitutes a congressionally developed alternative to the Rule 23 procedures.   *Donovan v. University of Texas at El Paso,* 643 F.2d. 1201, 1206 (5th Cir. 1981).

In contrast, the appellate courts (as well as the vast majority of district courts) have approved of the two-step method developed in *Lusardi v. Xerox Corp.,* 118 F.R.D. 351 (D.N.J. 1987).   *See, e.g., Theissen,* 267 F.3d at 1105; *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1219 (11th Cir. 2001).[4]   Under this approach, the district court makes an early decision as to whether notice of the

---

[3]   *See, e.g., De Asencio v. Tyson Goods, Inc.,* 342 F.3d 301, 306 (3rd Cir. 2003) (noting that FLSA cases *cannot* be certified under Rule 23, and that Rule 23 is *inapplicable* to FLSA actions); *Theissen v. GE Capital Corp.,* 267 F.3d 1095, 1105 (10th Cir. 2001) (to interpret the similarly situated standard by simply incorporating the requirements of Rule 23 . . . would effectively ignore Congress directive.); *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 n. 12 (11th Cir. 1996) (the requirements for pursuing a 216(b) class action are independent of, and unrelated to, the requirements for a class action under Rule 23 . . .); *King v. GE Co.,* 960 F.2d 617, 621 (7th Cir. 1992); *E.E.O.C. v. Pan American World Airways, Inc.,* 897 F.2d 1499, 1504 (9th Cir. 1990) (FLSA section 16(b) creates a vehicle, wholly apart from Fed. R. Civ. P. 23, for employees to bring . . . class actions for damages); *see also, Villatoro v. Kim Son Restaurant, L.P.,* 2886 F.Supp.2d 807, 809-10 (S.D. Tex. 2003) (noting that every appellate court to have addressed the issue has rejected *Shushan's* premise).

[4]   As Judge Lynn recognized, the two-step method is the prevailing test among the federal courts . . . .   *Barnett v. Countrywide Credit Industries, Inc.,* 2002 WL 1023161, at *2 (N.D. Tex. May 21, 2002).

action should be given to potential class members based on a preliminary showing of similar situations. *Mooney,* 54 F.3d at 1214. These cases make it clear that the similarly situated requirement is considerably less stringent that Rule 23's requirements. *See, e.g., Grayson v. K Mart Corp., 79* F.3d 1086, 1096 (11th Cir. 1996), *cert. denied,* 117 S. Ct. 435 (1996).

> 2. When Are Potential Class Members Similarly Situated?

Similarly situated, as contemplated by §16(b), does not mean identically situated. *See Grayson,* 79 F.3d at 1096; *Riojas,* 82 F.R.D. at 616; *see also Tucker v. Labor Leasing, Inc.,* 872 F. Supp. 941, 947 (M.D. Fla. 1994). Therefore, [w]hether at the notice stage or on later review, collective action certification is not precluded by the fact that the putative plaintiffs performed various jobs in differing departments and locations. *Donohue v. Francis Servs., Inc.,* 2004 WL 1161366, (E.D. La. May 24, 2004).

Instead, an FLSA class determination is appropriate when there is a demonstrated similarity among the individual situations . . . some factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged [policy or practice]. *Crain v. Helmrich & Payne Int'l Drilling Co.,* 1992 WL 91946, *2 (E.D. La. April 16, 1992) (certifying class of workers who were required to perform work prior to and after their paid shifts). Thus, a court can foreclose a plaintiff's right to proceed collectively only if the action relates to specific circumstances personal to the plaintiff rather than any

generally applicable policy or practice. *Id.; see also Wyatt v. Pride Offshore, Inc.,* 1996 WL 509654, *2 (E.D. La. Sept. 6, 1996). In making this determination, the district court should satisfy itself that there are other employees . . . who desire to opt-out and who are similarly situated with respect to their job requirements and with regard to their pay provisions. *Dybach v. Fla. Dep't of Corrections,* 942 F.2d 1562, 1567-68 (11th Cir. 1991). The similarly-situated requirement is more elastic and less stringent than that for joinder under Rule 20(a) or for separate trials under Rule 42(b). *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir. 1996), *cert. denied,* 117 S. Ct. 435 (1996).

To impose a strict standard of proof at the notice stage would unnecessarily hinder the development of collective actions and, thereby, would unnecessarily hinder the development of collective actions and, thereby, would serve to undermine the broad remedial goals of the FLSA. *Garner v. G.D. Searle, 802 F.Supp.* 418, 422 (M.D. Ala. 1991); *Sperling v. Hoffmann-LaRoche Inc.,* 118 F.R.D. 392, 407 (D.N.J.), *aff'd,* 862 F.2d 439 (3rd Cir. 1988), *aff'd,* 493 U.S. 165 (1989) (Notice to absent class members need not await a conclusive finding of similar situations.). Instead, the record need only be sufficiently developed . . . to allow court-facilitated notice based upon substantial allegations. *Id.; see also Church v. Consolidated Freightways, Inc.,* 137 F/R/D/ 294 (N.D. Cal. 1991), or some factual support. *Belcher v. Shoney's Inc.,* 927 F. Supp. 249, 251 (M.D. Tenn. 1996). Thus, the court's decision is usually made using a fairly lenient standard and is based

only on the pleadings and any affidavits which have been submitted.  *Mooney,* 54 F.3d at 1214.   Evaluation under the lenient similarly situated standard typically results in conditional certification  of a representative class and the issuance of a court-approved notice. *Id*

Courts have applied a variety of criteria in finding the necessary factual and/ or legal nexus.  Some courts have found plaintiffs and putative class members are similarly situated if they were victims of a single decision, policy, or plan. *Mooney,* 54 F.3d at 1214.  While the existence of a unified policy, plan or scheme is sufficient to meet the test, it is not required to satisfy the more liberal similarly situated requirement of § 16(b).  *Grayson,* at 1096.  Additionally, employees who are similarly situated with respect to their job requirements and with regard to their pay provisions possess the mandatory nexus.  *Dybach v. State of Florida Dep*'*t of Corrections,* 942 F.2d 1562, 1567-68 (11th Cir. 1991).   These criteria are easily applied to FLSA cases involving misclassification decisions, or where an illegal policy is written down (for example, where lunch periods are deducted from hours worked whether taken or not).

Informal and unwritten policies, procedures, and practices that contradict stated company policies are more difficult to analyze, but can still meet the similarly situated criteria.  The commonality requirement can be met by showing there is a policy, even if not formal.  *March v. Butler County School Sys.,* 242

F.Supp.2d 1086, 1093 (M.D. Ala. 2003); *Barron v. Henry County Shool Sys.,* 242 F. Supp.2d 1096, 1104 (M.D. Ala. 2003).   A legal and factual nexus is met when a discrete group of employees provides sufficient evidence of a pattern of FLSA violations.   *Marsh,* 242 F.Supp.2d at 1094.   Courts have recently addressed the similarly situated standard in the context of an off-the clock case.   In cases where the potential class members are properly classified as nonexempt employees, and their allegations are related to unpaid off-the-clock  work, it is not necessary that the potential class be comprised of individuals who have similar job duties as long as there is sufficient evidence of a commonality among employment actions to show a pattern that FLSA violations were occurring throughout the business. *Weaver v. Wal-Mart Stores, Inc.,* Civil Action No. 2-02-CV-220 (TJW) (E.D. Tex, August 23, 2004, Judge Ward) *citing Barron v. Henry County School Sys.,* 242 F.Supp.2d 1096, 1104 (M.D. Ala. 2003).   As set forth in the next section, Falcon has more than enough evidence to show that notice is warranted to Starbucks' Assistant Store Managers.

**B.   There is Substantial Evidence that the named Plaintiffs and other Former and Existing Employees of C & J are Similarly Situated in terms of Job Duties and Pay.**

 Accordingly, the evidence before the Court shows that the violation of the Act by C & J is widespread.   That is, the evidence shows that there is more than 200 former and existing employees were unlawfully classified as exempt from overtime pay and were never paid any overtime pay for hours worked in excess of

40 per week.  The evidence establishes that these employees are similarly situated because of the narrow scope of the employment.  Each of them performed the same coil tubing services in similar locations, with the only discernible difference from each job being the depth of the well.  Thus, the named plaintiffs and the potential class have almost identical job requirements and their pay provisions were identical.    Given that the named plaintiffs have produced some evidence that similarly situated plaintiffs exist, they have met their burden to show that potential class plaintiffs exist.

## RELIEF SOUGHT: DISCLOSURE OF NAMES AND ADDRESSES AND NOTICE TO CURRENT AND FORMER C & J EMPLOYEES

The plaintiffs have demonstrated the existence of a factual and/or legal nexus binding them to potential class members as victims of a policy or practice of C & J.[5]  They have detailed their collective action allegations and supported the allegations with their declarations and answers to discovery that show nothing but conealment of evidence that would also support collective action treatment.  They have presented evidence that other similarly situated individuals exist, and that C & J  has a practice of requiring its blue-collar workforce to work 100 hours per week or more without paying overtime pay.  This evidence more than satisfies the

---

[5]   A number of Texas courts have permitted discovery of the names and addresses of potential class members prior to a finding the notice is appropriate.  *Weaver v. Wal-Mart,* Civil Action No. 02-CV-220 (E.D. Tex. July 30, 2003) (permitting depositions prior to issuing notice); *Smith v. Integrated Electrical Servs., Inc.,* Civil Action No. 02-3254 (S.D. Tex. Aug. 21, 2003); *see also Tierney v. TMC Orthopedic, LP,* Civil Action No. H-03-2420, *1 (S.D. Tex. Mar. 19, 2004).

lenient–standard for collective action.[6]   *Mooney,* 54 F.3d at 1213-14.

The plaintiffs seek an Order from this court requiring C & J produce the names, addresses, phone numbers, and e-mail addresses of all current and former operators and coil tubing supervisors employed by C & J between November 22, 2006 and the present.   They also seek permission to issue notice to these individuals of the existence of this lawsuit and of their right to join it if they meet certain criteria.   Specifically, the notice will clearly indicate that only those individuals who worked in excess of 40 hours per work week, and who were denied overtime compensation for hours worked in excess of 40 hours per work week, are eligible to join the lawsuit.   The proposed notice and consent form are attached as Exhibit E.   The plaintiffs requests that C & J provide the contact information within 20 days from the entry of the Court's Order and in usable electronic form to reduce any delays in sending out the Notices.

## CONCLUSION

The plaintiffs have met their burden to produce evidence supporting the collective allegations in their live pleading.   Based on the evidence presented, and

---

[6]   Courts in Texas have approved similar classes of workers in off-the-clock cases.   *See, e,g., Williams v.LTD Financial Services I, Inc.,* Civil Action 04-1644 (S.D. Tex. Oct. 21, 2004) (J. Rainey) (affirming Magistrate Johnson=s decision to authorize notice to call center workers employed at two separate call centers); *Solis v. Hotels.com Texas inc.,* 2003 WL 22272008 (N.D. Tex. Oct. 01, 2003) (J. Sanderson) (authorizing notice to all hourly non-exempt call center workers   employed at three separate call centers); *Owens v. GEICO, Inc.;* Civil Action 3:03-CV-620-M (N.D. Tex. May 20, 2003) (J. Lynn) (certifying nationwide collective action for ten separate call centers located throughout North America).

the applicable legal standards, the Court should order disclosure of the contact information requested herein and permit the plaintiffs to issue notice to the potential class members, and for such other relief, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

s/Jon D. Brooks
Jon D. Brooks
Attorney-in-Charge
Southern District ID No. 24936
Texas Bar No. 24004563
400 Mann Street, Suite 1001
Corpus Christi, Texas 78401
361.885.7710 (telephone)
361.885.7716 (facsimile)
jbrooks@brooksllp.com (e-mail)

**Attorney for Plaintiffs and Putative Class Member**

OF COUNSEL

Bobby Bourlon
Southern District ID No. 1391
State Bar No. 24031753
THE BOURLON LAW FIRM
Alice, Texas 78332
361.664.1000 (telephone)
361.668.9531 (facsimile)
bourlonlawfirm@yahoo.com (e-mail)

BROOKS LLP
Attorneys and Counselors at Law
400 Mann Street, Suite 1001

Corpus Christi, Texas 78401
361.885.7710 (telephone)
361.885.7716 (facsimile)
www.brooksllp.com (web)

## **Certificate of Conference**

The undersigned certifies that he conferred with opposing counsel concerning the relief sought by this motion and that opposing counsel is opposed.

s/Jon D. Brooks
Jon D. Brooks

## **Certificate of Service**

The undersigned certifies that a true and correct copy of the foregoing document has been served on all parties of record by electronic e-mail from the Clerk of the Court, as provided by the rules, on this 4th day of March 2010, as follows:

Scott K. Davidson            sdavidson@lockelord.com
Locke Lord Bissell & Liddell LLP
600 Travis Street, Suite 3400
Houston, Texas 77002

s/Jon D. Brooks
Jon D. Brooks